UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

WALTER L. PERKINS, JR.,                  CIVIL ACTION
          Appellant                      NO. CV07-2106

VERSUS

MICHAEL J. ASTRUE, COMMISSIONER          JUDGE JAMES T. TRIMBLE
OF SOCIAL SECURITY,                      MAGISTRATE JUDGE JAMES D. KIRK
          Appellee


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Walter L. Perkins, Jr., ("Perkins") filed an application for disability insurance benefits on March 22, 2005, alleging a disability onset date of April 18, 2002 (Tr. p. 54), due to occipital neuropathy, severe nerve damage, black outs, loss of function, seizures, depression, sleep problems, arthritis, poor immunity, bad headaches, and blurred vision in right eye (Tr. p. 65). That application was denied by the Social Security Administration ("SSA") on July 6, 2005 (Tr. p. 48).

A de novo hearing was held before an administrative law judge ("ALJ") on May 8, 2007, at which Perkins was present with his attorney, a vocational expert ("VE"), and a witness (Tr. p. 432). The ALJ found that, although Perkins suffers from "severe" affective mood disorder (depression), occipital neuritis, and discogenic and degenerative disorders of the spine, and cannot perform his past relevant work as a truck driver, he does not meet or equal a Listing in Appendix I and he has the residual functional

capacity to perform some light work such as protective service worker, small products assembler, and unskilled cashier (Tr. pp. 16-22). The ALJ concluded that Perkins was not disabled within the meaning of the Social Security Act at any time through the date of the ALJ's decision on June 14, 2007 (Tr. p. 22).

Perkins requested a review of the ALJ's decision by the Appeals Council, but the Appeals Council declined to review it (Tr. p. 5), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Perkins next filed this appeal for judicial review of the Commissioner's final decision. Perkins raises the following issues for review on appeal:

1. The ALJ did not properly assess the limitations resulting from Perkins' occipital neuritis condition.

2. The ALJ did not address the frequency of Perkins' blackout spells (average one every five days) and how that medical condition would affect his employability.

3. The ALJ arrived at a residual functional capacity that was contrary to the medical evidence.

4. The ALJ incorrectly concluded that Perkins could understand simple instructions, concentrate/perform simple tasks and respond to work place changes and supervision.

5. The ALJ ignored the vocation evaluation prepared by VE Glen Hebert.

6. The ALJ placed an unreasonable amount of significance and weight on some of the initial medical opinions rendered long before appropriate diagnostic tests supported Perkins' complaints and symptoms.

<u>Eligibility for DIB</u>

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an

application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(i), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly

detracts from its weight.  <u>Singletary v. Bowen</u>, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987); <u>Dellolio v. Heckler</u>, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  <u>Allen v. Schweiker</u>, 642 F.2d 799, 801 (5th Cir. 1981).  Also, <u>Anthony v. Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. <u>Dellolio</u>, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."   <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

<u>Summary of Pertinent Facts</u>

At the time of his May 2007 administrative hearing, Perkins was 50 years old (Tr. p. 438), had an eighth grade education (Tr. p. 439), and had past relevant work as a truck driver (Tr. p. 21).

1.  Medical Records

Perkins was treated by Dr. Ernest A. Kufoy, an internist, from January 2002 through April 2007 for occipital neuritis[1] (Tr. pp.

---

[1] According to the National Institutes of Health - National Institute of Neurological Disorders and Stroke, occipital neuralgia is a distinct type of headache characterized by

120-175, 384-426).  In January 2002, Perkins' MRI scan of his head was normal, but the MRI of the neck showed small posterior protruding osteophytes from C3 to C7 (Tr. p. 174).  Osteoarthritis of the cervical spine was diagnosed, and Perkins was prescribed Relafen (Tr. p. 173) and Arthrotec, and was given a Kenalog injection (Tr. p. 172).  In April 2002, Perkins complained that he had lost consciousness a couple of times at work and was referred to Dr. Beclenger (Tr. p. 171).  An EEG (electroencephalogram, or

---

piercing, throbbing, or electric-shock-like chronic pain in the upper neck, back of the head, and behind the ears, usually on one side of the head.  Typically, the pain of occipital neuralgia begins in the neck and then spreads upwards.  Some individuals will also experience pain in the scalp, forehead, and behind the eyes.  Their scalp may also be tender to the touch, and their eyes especially sensitive to light.  The location of pain is related to the areas supplied by the greater and lesser occipital nerves, which run from the area where the spinal column meets the neck, up to the scalp at the back of the head.  The pain is caused by irritation or injury to the nerves, which can be the result of trauma to the back of the head, pinching of the nerves by overly tight neck muscles, compression of the nerve as it leaves the spine due to osteoarthritis, or tumors or other types of lesions in the neck.  Localized inflammation or infection, gout, diabetes, blood vessel inflammation (vasculitis), and frequent lengthy periods of keeping the head in a downward and forward position are also associated with occipital neuralgia. In many cases, however, no cause can be found.  A positive response (relief from pain) after an anesthetic nerve block will confirm the diagnosis.  Treatment is generally symptomatic and includes massage and rest.  In some cases, antidepressants may be used when the pain is particularly severe.  Other treatments may include local nerve blocks and injections of steroids directly into the affected area.  Occipital neuralgia is not a life-threatening condition.  Many individuals will improve with therapy involving heat, rest, anti-inflammatory medications, and muscle relaxants.  Recovery is usually complete after the bout of pain has ended and the nerve damage repaired or lessened. National Institutes of Health - National Institute of Neurological Disorders and Stroke: "Occipital Neuralgia Information Page," *available at* http://www.ninds.nih.gov/disorders/occipitalneuralgia/occipitalneuralgia.htm.

brain wave test) and an ECG (electrocardiogram, or EKG) were both normal (Tr. pp. 170-171). In June 2002, Perkins continued to complain of episodes of syncope (fainting or passing out). Dr. Kufoy noted that Dr. Beclenger had recommended occipital nerve infiltration, so he carried that out with a Kenalog injection (Tr. p. 168) which gave Perkins relief from headaches for a couple of weeks (Tr. p. 167).

In July 2002 through April 2005, Dr. Kufoy gave Perkins monthly Kenalog injections as well as vitamin B-12 injections, and a prescription for Neurontin (Tr. pp. 155-166). In August 2002, Perkins reported a return of syncopal episodes when the pain returned (Tr. p. 165), and, in December 2002, Perkins reported pain at the base of his neck with radiation (Tr. p. 160). In May 2003, Dr. Kufoy added a prescription for Fioricet (Tr. p. 154). In February 2004, Dr. Kufoy began prescribing Lexapro for Perkins' depression (Tr. p. 141); Perkins' depression began to improve within a month (Tr. p. 140). In September 2004, Perkins reported having insomnia, so Dr. Kufoy prescribed Ambien (Tr. p. 129), which was later changed to Halcion (Tr. p. 125).

On May 21, 2002, Dr. Mac Velingker, a neurologist, examined Perkins on referral from Dr. Kufoy (Tr. p. 185). Perkins' EEG was normal, but Dr. Velingker noted that did not rule out a seizure disorder (Tr. p. 183).

On April 9, 2003, Perkins was evaluated by Dr. Dan E. Butler, an orthopaedic surgeon, at the request of an insurance company (Tr. pp. 101-109). Dr. Butler noted that Perkins' had been injured in

a vehicular accident on January 2, 2007, while driving an 18-wheel truck, when a pickup truck struck him from behind (Tr. p. 101). Although Perkins complained only of a headache immediately after the accident, his condition progressively worsened until he passed out while driving on April 18, 2002 (Tr. p. 101). Perkins was then diagnosed with occipital neuralgia and an MRI revealed small posterior osteophytes present from C3 to C7 (Tr. p. 101).

Dr. Butler noted Perkins' stabbing pain in the posterior aspect of his head which encompassed his entire head, some aching on the right side radiating down to his ear, and a burning sensation, as well as "pins and needles" with numbness, on the entire right side, both front and back starting at the shoulder and going around the front of his body and down to the abdomen, the right arm, and the right leg (Tr. p. 101). Dr. Butler also noted Perkins' episodes of burning, tingling, cramping, and nausea which lead up to his right side giving out (Tr. p. 101). Perkins' pain was worsened by exercise, standing, walking, bending, coughing, sneezing, and loud noises, and was reduced by pain pills and a monthly Kenalog injection (Tr. p. 101). Dr. Butler noted that Perkins was taking Relafen, Neurontin, Arthrotec, Furinol, Nabumepone, and Kenalog (Tr. p. 102). Perkins was 5'10" tall, weighed 160 pounds, had a full range of motion in his cervical spine, but had tightness when he turned his neck to the right, had no loss of strength on either side, and his EEG and MRI were normal (Tr. p. 102). Dr. Butler stated that Perkins had reached maximum medical improvement, further changes were not expected if he

continued his Kenalog and B-12 injections, he did not have any pre-existing conditions, surgery was not recommended but counseling was, and concluded that Perkins would not be able to return to work at his present level of functioning (Tr. p. 102).

In August 2004, Dr. Leon A. Weisberg, a neurologist, examined Perkins and found multiple points of tenderness on the left side from the top of his head to the shoulder blade (Tr. p. 354). Dr. Weisberg also found somatization disorder with evidence of a major depressive illness unresponsive to Lexapro (Tr. p. 355). Dr. Weisberg stated he believed Perkins had myofascial pain syndrome rather than occipital neuralgia, but that the treatment was similar; he also found the numbness on Perkins' right side has a nonorganic basis, is part of a somatization disorder, and is a conversion syndrome, and found is no abnormality in the nervous system that would explain Perkins' symptoms. Dr. Weisberg found that Perkins' passing-out spells represent syncope and not seizures, and his memory impairment and difficulty with sleep are part of a major depressive illness (Tr. p. 355).

Perkins had a psychiatric and neurological evaluation by Dr. Paul D. Ware, a psychiatrist, in March 2005 (Tr. pp. 109-113). Dr. Ware diagnosed adjustment disorder of adulthood with significant anxiety at Axis I and moderate psychosocial stressors at Axis IV causing marked limitations and difficulties, and a present GAF[2] of

---

[2] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the

50-55 (Tr. pp. 109-112). Dr. Ware also noted that Perkins has "possible occipital neuritis and possible seizure disorder" at Axis III, and stated that he did not think Perkins' medical history

_____

global (overall) assessment of functioning. <u>Diagnostic and Statistical Manual of Mental Disorders, Text Revised</u>, pp. 25-35 (4th ed. 2000) ("<u>DSM-IV-TR</u>").

The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system. <u>Diagnostic and Statistical Manual of Mental Disorders, Text Revised</u>, pp. 25-30 (4th ed. 2000). GAF is a standard measurement of an individual's overall functioning level. The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical continuum of mental health-illness. The first number indicates the patient's current GAF, while the second number indicates the highest score reported in the previous year. <u>DSM-IV-TR</u> at 32-34. The GAF scale goes from 0-100: **91-100** - superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities, no symptoms; **81-90** - absent or minimal symptoms, good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns; **71-80** - if symptoms are present, they are transient and expectable reactions to psycho-social stressors, not more than slight impairment in social, occupational, or school functioning; **61-70** - some mild symptoms OR some difficulty in social, occupational or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships; **51-60** - moderate symptoms OR moderate difficulty in social, occupational, or school functioning; **41-50** - serious symptoms OR serious impairment with social, occupational, or school functioning; **31-40** - some impairment in reality testing or communication OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood; **21-30** - behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgement OR inability to function in almost all areas; **11-20** - some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication; **1-10** - persistent danger of severely hurting self or others OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death; and **0** - inadequate information. <u>DSM-IV-TR</u>, at 34. Also, <u>Boyd v. Apfel</u>, 239 F.3d 698 (5th Cir. 2001).

supported his complaints of memory difficulty, occasional weakness of the right arm and leg, and his difficulty with gait which causes him to fall (Tr. p. 113).

In March 2005, Perkins' neurological exam revealed left occipital neuralgia and left trapezius tightness with spasms (Tr. p. 183), and an EEG was normal (Tr. p. 180). Dr. Velingker noted that it was unusual for a patient to require more than 1 to 3 injections to fully resolve occipital neuralgia (Tr. p. 182). Dr. Velingker also noted that Perkins' syncopal spells were unexplained, recommended getting an EEG and a sleep study, recommended reduction in the use of narcotics, and told Perkins he should not drive and should observe seizure precautions (Tr. p. 182). The sleep study demonstrated that Perkins has periodic leg movement syndrome and frequent PVC (premature ventricular contractions, or extra heartbeats) (Tr. pp. 350-351). At the end of March 2005, Dr. Velingker found Perkins' EEG report was normal and showed his syncopal spells were not epileptic, and advised Perkins to do neck exercises at home and try to get formal physical therapy (Tr. p. 179). Dr. Velingker's diagnosis was left occipital neuralgia, syncopal spells, and myofascial neck pain (Tr. p. 179).

In March 2005, Perkins' EKG by Dr. Kufoy was normal (Tr. p. 121), and a sleep study revealed periodic leg movement syndrome, for which Perkins was prescribed Clonazepam and Mirapex (Tr. p. 120). In April 2005, Dr. Kufoy continued Perkins' Clonazepam, Mirapex, Kenalog injections, Lexapro, and Halcion (Tr. p. 384-386). Dr. Kufoy started prescribing Percocet for Perkins' neck pain in

June 2005, and otherwise continued the same treatments for Perkins'
occipital neuritis, periodic limb movement syndrome, insomnia, and
depression through April, 2007 (Tr. pp. 387-426).  In March 2006,
Perkins reported chest pain, for which Dr. Kufoy administered an
EKG test and diagnosed sinus bradycardia, which was treated with a
B12 injection (Tr. p. 404).  Perkins also suffered from dermatitis
rashes and lesions (dermatomycosis) on his body from 2005 through
2006, which were treated with Lamisil (Tr. pp. 391-426).

In April 2005, Perkins was examined by Dr. Robert K. Rush, a
specialist in preventive and occupational medicine (Tr. pp. 114-
116).  Dr. Rush noted atrophic skin changes on Perkins' arms, hands
and legs, with multiple ecchymosis,[3] probably secondary to long
term cortisone usage, tenderness involving the left occiput,[4] and
tightness and tenderness in the left levator muscle with a good
range of motion of his cervical spine, ninety degree straight leg
raises bilaterally without pain, and tenderness in the right
sacroiliac joint (Tr. p. 115).  Dr. Rush diagnosed chronic pain
syndrome with major depression, occipital neuritis with severe

_____

[3] Ecchymosis is defined as (1) the escape of blood into the
issues from ruptured blood vessels marked by a livid black and
blue or purple spot or area, and (2) the discoloration so caused.
MEDLINEplus Health Information, Merriam-Webster Medical
Dictionary: Ecchymosis, *available at*
http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=
ecchymosis (a service of the U.S. National Library of Medicine
and the National Institutes of Health).

[4] The occiput is the back part of the head or skull.
MEDLINEplus Health Information, Merriam-Webster Medical
Dictionary: Occiput, *available at*
http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=
occiput (a service of the U.S. National Library of Medicine and
the National Institutes of Health).

headaches, and right sacroiliac dysfunction with piriformis syndrome[5] (Tr. p. 115), and recommended an MRI of the lumbar spine, aggressive physical therapy for SI dysfunction, taking Lexapro (for depression) in the morning instead of evening due to sleep disturbance, a prompt follow-up with Dr. Ware due to Perkins' suicidal ideations, and a possible occipital nerve block rather than repeated cortisone injections (Tr. p. 115). Dr. Rush stated that Perkins could not return to his work as a truck driver (Tr. p. 116).

An MRI of Perkins' lumbar spine, conducted in April 2005, showed mild degenerative arthropathy at L2-3, mild degenerative facet arthropathy and a mild broad based disc bulge with right

---

[5] According to the National Institutes of Health - National Institute of Neurological Disorders and Stroke, piriformis syndrome is a rare neuromuscular disorder that occurs when the piriformis muscle compresses or irritates the sciatic nerve - the largest nerve in the body. The piriformis muscle is a narrow muscle located in the buttocks. Compression of the sciatic nerve causes pain, frequently described as tingling or numbness in the buttocks and along the nerve, often down to the leg. The pain may worsen as a result of sitting for a long period of time, climbing stairs, walking, or running. Generally, treatment for the disorder begins with stretching exercises and massage. Anti-inflammatory drugs may be prescribed. Cessation of running, bicycling, or similar activities may be advised. A corticosteroid injection near where the piriformis muscle and the sciatic nerve meet may provide temporary relief. In some cases, surgery is recommended. The prognosis for most individuals with piriformis syndrome is good. Once symptoms of the disorder are addressed, individuals can usually resume their normal activities. In some cases, exercise regimens may need to be modified in order to reduce the likelihood of recurrence or worsening. National Institute of Neurological Disorders and Stroke: "Piriformis Syndrome Information Page*," available at* http://www.ninds.nih.gov/disorders/piriformis_syndrome/piriformis_syndrome.htm#Is_there_any_treatment.

lateral annular tear at L3-4, a moderate sized disc bulge with a right foraminal and lateral component, moderate facet arthropathy bilaterally, a moderate degree of foraminal stenosis on the right and mild on the left at L4-5, and mild to moderate facet arthropathy and minimal disc bulge at L5-S1 (Tr. p. 117). The diagnosis was moderate foraminal stenosis right at L4-5 with possible compression of the exiting right L4 nerve root, mild foraminal stenosis right at L3-4 and left L4-5, likely not clinically significant, and degenerative disc and facet changes (Tr. pp. 117-118, 350-351).

In April 2005, Dr. Ware (psychiatrist) found Perkins had a major depressive disorder which had improved with medication, a conversion disorder, pseudoseizures, and disassociative episodes at Axis I, noted moderate psychosocial stressors with marked limitations and difficulty in functioning in all areas at Axis IV, and a present GAF of 50-55 (Tr. pp. 193-194). In May 2005, Dr. Ware noted that Perkins' syncopal episodes occur for about a week prior to his injections for his headaches, the injection makes him headache-free for about two weeks, then the headaches return, he takes injections about every three weeks, and he does not in any way abuse his hydrocodone prescription, taking a minimal amount only when he has a headache (Tr. p. 189). Dr. Ware recommended that Perkins see a cardiologist or an internist for his syncope, or be admitted to a seizure treatment unit for monitoring (Tr. p. 190).

In June 2005, Dr. Velingker noted that Perkins was off of

Cymbalta, Lexapro, and hydrocodone, was taking Lonopin for periodic limb movements with sleep, Xanax for anxiety, and Percocet for pain (Tr. p. 191). Dr. Velingker emphasized that taking too much narcotic medication can cause rebound headaches (Tr. pp. 191, 359). In October 2005, Dr. Velingker recommended that Perkins decrease his injections (which he took once every three weeks) due to the side effects of bruising skin breakdown, and told him to decrease his Percocet due to the rebound headaches, drowsiness, and addiction (Perkins was taking it four times a day) (Tr. p. 366). In April 2006, Dr. Velingker noted an EMG showed Perkins has right lumbar radiculopathy, as well as passing out spells and occipital neuralgia, and recommended that he see a pain management doctor (Tr. p. 376).

In June 2006, Dr. Ware noted Perkins's depression, lethargy, and irritability had not improved in the last year, and that Perkins was having marked trouble with concentration, focus, energy level, and memory (Tr. p. 378). Dr. Ware discontinued Perkins' Lexapro because it was not helping and prescribed Wellbutrin instead, and Trileptal for irritability and "seizure activity" (Tr. pp. 378-379).

An EEG in November 2006 was "questionably abnormal" because of the presence of slow, sharp-looking activity in the parietal area and sometimes left temporal area on the same side, while there was no change in the background activity when Perkins blacked-out during the test (Tr. p. 352).

2. Dr. Kufoy's Deposition

In a deposition on November 1, 2005 (Tr. p. 222), Dr. Kufoy reviewed his medical records for Perkins. Dr. Kufoy testified that Perkins was first diagnosed with occipital neuritis by Dr. Velingker, a neurologist, and Dr. Kufoy agreed with that diagnosis (Tr. p. 246). Dr. Kufoy testified that Perkins' occipital nerve injections infiltrate that nerve with an anesthetic and a corticosteroid to relieve both pain and inflammation (Tr. pp. 245, 248). According to Dr. Kufoy, Perkins' syncope is associated with his pain (Tr. pp. 251-252). Dr. Kufoy testified that Perkins should not drive due to syncope and exacerbation of pain (Tr. pp. 261-262). Dr. Kufoy testified that neither surgery nor physical therapy are treatment options for occipital neuritis (Tr. p. 273). Dr. Kufoy testified that he has not had another patient with occipital neuritis need as many injections as Perkins (Tr. pp. 300-301), but that 20 to 30 percent of patients do not respond to Kenalog or steroid injections and become chronic patients (Tr. p. 312).

Dr. Kufoy testified that Perkins has limitations of not lifting anything that weighs two or more pounds, no carrying or reaching above his head, no driving, and no climbing stairs (Tr. pp. 293, 307). Dr. Kufoy further testified these restrictions are due to syncope and pain (Tr. p. 305). Dr. Kufoy testified that Perkins' combination of the syncope and occipital neuritis is disabling, and that he does not believe Perkins is malingering (Tr. pp. 313-314). Dr. Kufoy further testified that Perkins' medication for periodic leg movement syndrome would also keep him from driving

15

a truck due to loss of attention and tiredness (Tr. pp. 308-309).

### 3. 2007 Administrative Hearing

At his May 2007 administrative hearing, Perkins testified that he was fifty years old, married, has two grown children and three grandchildren, has an eighth grade education, and has been receiving worker's compensation since 2002 ($389 per week) (Tr. pp. 438-439).

Perkins testified that, in 2002, a car rear-ended his eighteen-wheel truck when he was stopped at a red light in Glenmora, Louisiana (Tr. p. 439).  The driver of the other car was a drunk woman who was being chased by the police when she drove into the back of Perkins' eighteen-wheel truck (which was empty at the time) at over 80 miles an hour (Tr. pp. 439-440, 455).  Perkins testified that he bumped his head, had a bloody mouth, and immediately had a headache (Tr. p. 455), but was not hospitalized after the accident, and continued to drive until April 2002, when he blacked out while driving (Tr. p. 440).  Perkins also began having severe headaches after the accident (Tr. p. 440).  Perkins started seeing Dr. Kufoy, who diagnosed syncope and occipital neuritis (Tr. p. 455).  Perkins testified that he has been taking injections every three weeks for the last five years for his headaches (Tr. p. 440).

Perkins also testified that he has spurs on his spine which have caused tingling since 2002 (Tr. pp. 440-441).  Perkins has not had surgery but takes medication to ease the pain (Tr. p. 441).

Perkins testified that he last saw a doctor for his back in

mid-2006 (Tr. p. 442), and he last saw a doctor for an injection and other medication in April 2007 (Tr. p. 443).[6]  Perkins testified that he sees his psychiatrist, Dr. Ware, every three to four months for his depression (Tr. p. 445).

Perkins also has carpal tunnel syndrome which causes tingling and numbness in his hands (Tr. p. 461).  An EEG or EMG in 2006 showed abnormal brain function, possibly on the right side (Tr. pp. 461, 478).  For that test, Perkins was hooked up to electrodes for 48 hours and had a black-out spell during that time (Tr. p. 478).  Perkins testified he has also been diagnosed with both motor and sensory peripheral neuropathy, as well as arthritis (Tr. p. 461).  An MRI showed radicular pain in Perkins' low back (Tr. p. 460).

Perkins testified that he has not worked since 2002 and that, on a typical day, he alternates sitting, standing, and laying down because he can't sit or stand for long, he watches a couple hours of TV, reads, sits outside, and visits for one or two hours with family members who stop by (Tr. pp. 448-450, 469).  Although Perkins' wife has a computer, Perkins does not use it (Tr. p. 450).  Perkins testified that he used to hunt and fish, but has not done so since the accident (Tr. p. 452).  Perkins testified that he tries to do a few things around his house, but he usually falls, blacks out, or bumps into things and hurts himself (Tr. p. 449).  Either Perkins' wife or her mother stays at the house with Perkins,

---

[6] The ALJ advised Perkins to ask about having a nerve decompression procedures for his headaches (Tr. pp. 443-444). Although Perkins complains about this in his brief, it is noted that the ALJ did not mention this "advice" in his decision.

and several of Perkins' family members live close by (Tr. p. 449). Perkins testified that he has not driven since April 2002; Perkins' wife drives his 1999 pickup truck (Tr. p. 449). Perkins testified that he has smoked about a pack of cigarettes a day for fifteen years (Tr. p. 452). Perkins testified that his restless leg syndrome prevents him from sleeping well at night, so he averages two to four hours of sleep a night, and naps some during the day (Tr. pp. 464-465). Perkins also testified that his appetite is very poor (Tr. p. 466).

Perkins testified that he can sit for about an hour, stand about thirty minutes, and walk about 100 yards (Tr. p. 452); he doesn't do any lifting because Dr. Kufoy told him not to (Tr. p. 453). Perkins testified that he uses a cane because Dr. Kufoy recommended he do so about two years ago (Tr. pp. 453, 469-70). Perkins testified that his wife takes care of the chores inside the house, and his father and his wife's nephew do the chores outside (Tr. p. 453). Perkins does not do yard work, house work, or cook, but can shower by himself since he had a rail installed in the shower (Tr. p. 465). Perkins can get a glass out of a cabinet, but stated he does not have to reach very far to do so (Tr. p. 466). Perkins testified that he has problems with his grip strength in both hands because he has tingling in his fingers, and tends to drop things when he tries to hold them in his right hand (Tr. p. 466). Perkins testified that he cannot work because he has fallen or bumped into things, tearing his skin, when he has tried to do yard work (Tr. p. 453). Perkins testified the doctors told him

18

that his skin disorders and susceptibility to tearing are a side effect of the Kenalog injections (Tr. p. 459).

Perkins testified that his headaches affect his memory, and that his headache pain is usually on a scale of 4/10 to 10/10 (Tr. p. 456). Perkins testified that the Kenalog injected for his headaches is a steroid which alleviates the pain for seven or eight days (Tr. p. 456); when it wears off, he takes Percocet four times a day for pain (Tr. p. 457). Perkins testified that all of his doctors have diagnosed occipital neuritis, and none of them have suggested a surgical alternative to his medications (Tr. pp. 457-459). Perkins testified that Dr. Ware ruled out a seizure disorder, but was unable to determine the cause of Perkins' syncope (Tr. p. 459). Dr. Rush's MRI of Perkins' lower back was positive for radicular pain (Tr. p. 459). Perkins also testified that he has been diagnosed with carpal tunnel syndrome, motor and sensory peripheral neuropathy, arthritis, and depression (Tr. pp. 461-462).

Perkins testified that his driver's license had been taken away because of syncope (Tr. p. 462), and Dr. Kufoy told him not to lift more than two pounds and not to climb ladders (Tr. p. 463). Perkins testified that his syncope (or black out spells) has progressively worsened and he currently has episodes of syncope (black-out spells) two to four times a week (Tr. p. 463). Perkins' wife quit working because she would sometimes come home to find him passed out, and the doctor told her that Perkins should not be alone (Tr. p. 454).

Perkins testified that his last black-out was two days before

his hearing (Tr. p. 455). Perkins testified that he is unable to describe his black-outs because they are sudden - he has a headache then he wakes up in a different place (Tr. pp. 455-456). Perkins testified that he blacks out faster when the temperature is hot (Tr. p. 467).

Perkins testified that he takes Percocet four times a day for headache pain, a muscle relaxer three times a day for his right shoulder pain, Lexapro at night for depression, two sleeping pills at night, Prileptal twice a day for black-outs, and something for when he his medications upset his stomach (Tr. pp. 467-468). Perkins testified that his medications affect his memory, particularly Percocet and Kenalog (Tr. pp. 460, 469), and that the steroid injections cause his skin to rip and tear easily (Tr. p. 460).

Perkins' wife, Betty Perkins, testified that they have been married 29 years, and that Perkins always worked hard and used to do the yard work and home maintenance (Tr. p. 472). Betty testified that, before the accident, Perkins loved his job and worked extra days, but since the accident he has not been able to drive at all, so Betty drives him everywhere (Tr. p. 472). Betty testified that Perkins' black-out spells began about two weeks after the accident and became progressively more frequent (Tr. pp. 472-473). Betty testified that she kept a journal from December 31, 2005, through December 31, 2006, and that Perkins had 71 black-out spells during that time. Betty testified that Perkins has black-out spells when he is sitting, standing, and walking,

sometimes in the middle of a conversation, and not on any particular "time line" (Tr. p. 473). Betty testified that, if Perkins is sitting, he starts drooping and leaning forward and is unresponsive for two to fifteen minutes; Betty touches him to make him fall backward against the couch instead of forward onto the floor (Tr. p. 474). Betty testified that the black out spells usually only last three to five minutes (Tr. p. 477). Betty testified that she is a CNA, so after a black-out, she checks Perkins' pulse, breathing, and blood pressure, which is usually a little elevated (Tr. p. 474). Betty testified that she does not take Perkins to the hospital after a black-out episode because it is not necessary – he is always fine when he comes out of it, although his head may hurt worse afterward (Tr. pp. 474, 477). Betty testified that, when Perkins first started having seizures, they were similar to epileptic seizures, but Perkins does not have epilepsy (Tr. pp. 474-475). Betty testified that, according to the doctors, Perkins has occipital neuritis and he blacks-out because his brain "can only take so much pain" before it "shuts down" (Tr. p. 475).

Betty Perkins also testified that Perkins has become very depressed and, when she had to quit her job to stay home with him, he talked about suicide and was angry about everything (Tr. p. 474). Betty testified that Perkins' depression has worsened, he does not have any energy, he may stay in his pajamas all day, and he may not feel well all day (Tr. p. 475). Betty testified that Perkins does not complain but she can tell when he is in pain; some

times the color in Perkins' face changes and he sits and hold his head and rocks back and forth (Tr. pp. 476-477).

VE Charles Poor testified that Perkins' past work as a truck driver was medium, semi-skilled work (Tr. pp. 479-480). The ALJ posed a hypothetical involving a person of Perkins' age and education, with the ability to lift 20 pounds occasionally and 10 pounds frequently, who must have a sit-stand option, can walk for four hours in eight, cannot be exposed to extreme temperatures, cannot climb stairs, ladders, ropes or scaffolds, cannot run, cannot work around heavy machinery or heights, has the ability to get along with others, understands simple instructions, can concentrate/perform simple tasks, and can respond and adapt to workplace changes and supervision (Tr. p. 473). The VE testified that such an individual would not be able to do his past relevant work as a truck driver (Tr. p. 483), but could do unskilled, light work such as protective service worker (3.9 million jobs nationally and 52,000 jobs in Louisiana), small products assembler (1.5 million jobs nationally and 4300 jobs in Louisiana), or unskilled cashier (1.1 million jobs nationally and 22,000 jobs in Louisiana) (Tr. pp. 484-485).

The ALJ posed a second hypothetical involving the ability to lift/carry 10 pounds occasionally and 5 pounds frequently, with all other factors from the first hypothetical remaining the same (Tr. p. 485). The VE testified that the jobs previously mentioned are available at the sedentary work level, although the numbers of jobs would be reduced by a third to a half (Tr. pp. 485-486).

The ALJ posed a third hypothetical in which all of the factors in hypothetical two remained the same but with the additional element of an inability to sustain an eight-hour day (Tr. p. 486). The VE testified there were not any jobs such an individual would be able to perform (Tr. p. 486).

The VE further testified that not many employers would employ a person who had frequent black-out spells, although there were a few who hired people with epilepsy (Tr. p. 486). The VE also testified that, if an individual does not have the ability to perform simple work tasks due to taking narcotics daily for pain, he would not be able to perform any jobs (Tr. pp. 487-488). Finally, the VE explained that work as a protective service worker included jobs such as gate attendant or security at a mall, church parking lot, or industrial complex; such a worker would be a physical presence who would notify authorities if he saw something happen, but would not actually carry a gun, make an arrest, or apprehend an offender (Tr. p. 488).

## ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a). The sequential process required the ALJ to determine whether Perkins (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not

disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Perkins has not engaged in substantial gainful activity since April 18, 2002 (Tr. p. 16), his disability insured status expired on December 31, 2007 (Tr. p. 16), and he has severe impairments of affective mood disorder (depression), occipital neuritis, and discogenic and degenerative disorders of the spine (Tr. p. 16), but he does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 18). The ALJ also found that Perkins is unable to perform his past relevant work as a truck driver (Tr. p. 21).

At Step No. 5 of the sequential process, the ALJ further found that Perkins has the residual functional capacity to perform light

work[7] except as reduced by his inability to walk more than four hours in an eight hour day, the requirement of a sit/stand option to alternate position at will, his inability to climb stairs, ladders, ropes, scaffolds, run, operate heavy machinery, work in temperature extremes or a heights, and his ability to understand only simple instructions, and concentrate on and perform only simple tasks (Tr. p. 19). The ALJ found that the claimant is a younger individual with a limited education and no transferable work skills (Tr. pp. 21). The ALJ concluded that there are a significant number of light, unskilled jobs in the regional national economies which Perkins can perform, such as protective service worker, small products assembler, and unskilled cashier (Tr. p. 22) and, therefore, Perkins was not under a "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision on June 14, 2007 (Tr. p. 22).

## Law and Analysis

Perkins contends the ALJ did not properly assess the limitations resulting from Perkins' occipital neuritis, did not address the frequency of Perkins' blackout spells (average one every five days) and how that medical condition would affect his

---

[7] "Light work" is defined in 20 C.F.R. § 404.1567(b) and § 416.967(c) as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."

employability, and points out that the ALJ placed an unreasonable amount of significance and weight on some of the initial medical opinions, which were given long before appropriate diagnostic tests supported Perkins' complaints and symptoms. Perkins also contends the ALJ arrived at a residual functional capacity that was contrary to the medical evidence, incorrectly concluded that Perkins could understand simple instructions, concentrate/perform simple tasks and respond to work place changes and supervision, and ignored the vocational evaluation prepared by VE Glen Hebert.

The ALJ did not find that Perkins suffers from a seizure disorder (Tr. p. 16), stating that a medically determinable impairment may not be established solely on the basis of symptoms alone or claimant's allegations regarding symptomatology (Tr. p. 17).[8] It appears the ALJ confused "seizure disorder" with syncope,[9] despite the fact that the medical evidence from Dr. Kufoy, Dr. Velingker, Dr. Weisberger, Dr. Butler, and Dr. Ware distinguished the two and show that, although Perkins does *not* have a seizure

_____

[8] The ALJ's brief discussion of seizure disorder is very confusing and apparently includes at least one typographical error. However, the ALJ appears to be stating there is no medical evidence of a seizure disorder (Tr. p. 17).

[9] The ALJ noted that a seizure disorder must be supported by medical evidence such as specified in the Listings in Appendix I. Since syncope is not a seizure disorder, it may be established by other evidence. Moreover, syncope may be accepted as a severe symptom of unknown or uncertain etiology. See Titterington v. Barnhart, 174 Fed.Appx. 6 (3d Cir. 2006)(severe syncope, probably cough-induced); Hensley v. Barnhart, 105 Fed.Appx. 677 (6th Cir. 2004)(severe depression, anxiety, syncope); Hickman v. Sec'y of Health and Human Serv., 895 F.2d 1413 (6th Cir. 1990).

disorder, he suffers from "fainting spells," or syncope,[10] perhaps due to pain and/or mental problems stemming from his occipital neuritis and depression.[11] Although the exact cause(s) of Perkins' syncope was never determined, Perkins' doctors recognized and accepted that he suffers from syncope and that it is probably caused by one or more of Perkins' other impairments.

The ALJ appears to have simply misunderstood that there is a difference between seizures and syncope, and thus failed to find that Perkins suffers from syncope. However, by failing to find that Perkins suffers from syncope, the ALJ failed to include the factor of Perkins' syncope in his assessment of Perkins' residual functional capacity. A claimant's impairments may cause physical or mental limitations that affect what he can do in a work setting. Residual functional capacity is a medical assessment, based upon all of the relevant evidence, of the work a claimant can perform despite his or her limitations. 20 C.F.R. §404.1545, §416.945.

---

[10] In August 2004, Dr. Weisberg stated the numbness on Perkins' right side has a nonorganic basis and is part of a somatization disorder and is a conversion syndrome, there is no abnormality in the nervous system that would explain Perkins' symptoms, the passing out spells represent syncope and not seizures, and the memory impairment and difficulty with sleep are part of a major depressive illness. In April 2005, Dr. Ware diagnosed Perkins' major depressive disorder, conversion disorder, pseudoseizures, and disassociative episodes, and, in May 2005, Dr. Ware noted that Perkins' syncopal episodes occur for about a week prior to his injections for his headaches, and recommended that Perkins see a cardiologist or an internist for his syncope. Also, an episode of syncope was recorded during Perkins' 2006 EEG test.

[11] The Commissioner's statement, in his brief at page 6, that there were physicians of record who found no medical evidence of disability is incorrect.

Although the burden of proof in a disability case is on the claimant to show that he is unable to perform his usual line of work, once that fact is established, the burden shifts to the Commissioner to show that the claimant is able to perform some other kind of substantial work available in the national economy. Herron v. Bowen, 788 F. 2d 1127, 1131 (5th Cir. 1986), and cases cited therein. Also, Babineaux v. Heckler, 743 F.2d 1065, 1067 (5th Cir. 1984). The Commissioner has the burden to establish a claimant's residual functional capacity. Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995).

For cases at the administrative law judge hearing level, the ALJ has the responsibility for deciding a claimant's residual functional capacity. 20 C.F.R. § 404.1546, § 416.946. The ALJ must perform a "function-by-function" assessment of the claimant's ability to engage in work-related activities when making his RFC determination. S.S.R. 96-8p. Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001).

When the ALJ failed to recognize that Perkins has syncope episodes, which average about one every five days, according to Betty' Perkins' diary of 71 episodes in 2006, the ALJ also failed to consider that Perkins must take seizure precautions (i.e., refrain from activities in which a sudden loss of consciousness could result in serious injury, such as driving, and take adequate precautions during certain activities, such as swimming),[12] as

_____

[12] See MEDLINEplus Health Information, Tutorials, "Seizures and Epilepsy, Reference Summary," *available at* http://www.nlm.nih.gov/medlineplus/tutorials/seizuresandepilepsy/

instructed by Dr. Kufoy and Dr. Velingker.  The ALJ also did not

consider the effects of those precautions, as well as the frequency

of Perkins' black-outs, on his residual functional capacity and

employability.

Also, the ALJ decided Perkins can lift and carry 20 pounds

occasionally and 10 pounds frequently based on a 2005 state agency

residual functional capacity assessment made by a Social Security

Administration employee who was not a physician[13] (pp. 21, 213-220),

despite the fact that Perkins' treating physician, Dr. Kufoy, had

limited him to no more than two pounds.  Generally, the opinion of

a treating physician deserves to be given greater weight than that

of a non-treating or consulting physician.  Carry v. Heckler, 750

F.2d 479, 484 (5th Cir. 1985).  However, the weight to be given a

physician's statement is dependent upon the extent it is supported

by specific clinical findings.  Elzy v. Railroad Retirement Board,

782 F.2d 1223, 1225 (5th Cir. 1986);  Jones v. Heckler, 702 F.2d

616, 621 (5th Cir. 1983).  Since Dr. Kufoy's opinion is supported

by several years of treatment of Perkins, as well as a multitude of

diagnostic tests, the ALJ erred in relying on the opinion of a non-

physician instead of Dr. Kufoy's.  Therefore, substantial evidence

does not support the ALJ's findings as to Perkins' physical

---

nr049102.pdf (a service of the U.S. National Library of Medicine
and the National Institutes of Health).  See also, *The Merck
Manuals Online Medical Library*, "Seizure Disorders", available at
http://www.merck.com/mmhe/sec06/ch085/ch085a.html.

   [13] There is no curriculum vitae in the record for the Social
Security employee who signed the form, nor did the employee
include "M.D." after his name.

residual functional capacity.

Perkins also points out that he cannot walk four out of eight hours, as found by the ALJ, due to his back pain, and that the ALJ failed to consider the side effects of his narcotic medication on his ability to work. The ALJ's decision does not reflect any consideration given to medication side-effects, as required by S.S.R. 96-7p. See <u>Salgado v. Astrue</u>, 271 Fed. Appx. 456, *5-*6 (5th Cir. 2008). However, the ALJ made a credibility determination, based on medical records from 2004 and 2005, as to Perkins' claim that he has difficulty walking (Tr. p. 20). That determination may be reconsidered, based on subsequent medical records and in light of Perkins' syncope and medication side effects, on remand.

Next, Perkins contends the ALJ failed to recognize his marked limitations in memory and concentration caused by his depression, as discussed by both Dr. Ware and Dr. Weisberg, and therefore erred in concluding Perkins has the residual functional capacity to understand and perform simple tasks. The ALJ relied on a 2005 assessment by Dr. Ware, indicating Perkins' problems were only moderate, to determine that Perkins was exaggerating his memory problems (Tr. p. 18). Since the ALJ did not mention the June 2006 assessment by Dr. Ware in his decision, in which Dr. Ware stated that Perkins was having marked difficulties with concentration, focus, energy level, and memory (Tr. p. 378), it appears the ALJ's credibility determination as to Perkins' memory and concentration problems is not supported by substantial evidence. This factor should also be reconsidered on remand in determining Perkins' true

residual functional capacity.

Finally, Perkins contends the ALJ failed to consider the vocational report prepared by Glen Hebert. VE Glen Hebert prepared a report in October 2004 which summarized Perkins' medical records and concluded that Perkins was not a viable candidate for any type of vocational rehabilitation services and that, based on his medical records, there were no jobs which Perkins would be able to perform (Tr. pp. 86-90). The ALJ did not mention Hebert's report in his decision. However, since the report was from 2004, Hebert did not have Perkins' more recent medical records to consider. Moreover, it is the responsibility of the ALJ, not the VE, to make residual functional capacity determinations. Finally, given the fact that Perkins' case must be remanded to the Commissioner for consideration of his syncope, Perkins cannot show prejudice from the ALJ's failure to consider Hebert's 2004 report. This issue is meritless.

The ALJ's residual functional capacity assessment of Perkins and his hypotheticals to the VE are deficient, since they did not include consideration of Perkins' syncope or correct determination of Perkins' mental and physical capacities. Therefore, the ALJ's determination of non-disability, based on the defective hypotheticals posed to the VE, cannot stand. See Boyd v. Apfel, 239 F.3d 698, 706-707 (5th Cir. 2001), citing Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994). Substantial evidence does not support the ALJ's findings as to Perkins' residual functional capacity or the Commissioner's conclusion that Perkins is not

disabled.

Since substantial evidence does not support the conclusions of the ALJ and the Appeals Council, their decision is incorrect as a matter of law. However, this does not entitle Perkins to a decision in his favor based upon the existing record. The record is simply inconclusive as to whether there are any jobs existing in sufficient numbers in the national economy which Perkins can perform, given his true impairments. Therefore, Perkins' case should be remanded to the Commissioner for further proceedings.

### Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be VACATED and that Perkins' case be REMANDED to the Commissioner for further proceedings.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM**

**ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 22nd day of August, 2008.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE